## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CLIFF NIIRANEN and ROBERT TREADWAY, | ) ) ) | |
| Plaintiffs, | ) ) | No. 20-cv-06781 |
| v. | ) ) | Judge Andrea R. Wood |
| CARRIER ONE, INC. and IVAN SAMAROV, | ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Robert Treadway is a former over-the-road driver for Defendant Carrier One, Inc. ("Carrier One"). Treadway alleges that, during his employment, Carrier One and Defendant Ivan Samarov failed to pay him all compensation owed and took unlawful deductions from his wages, thereby violating the federal Truth-in-Leasing regulations, 49 C.F.R. § 376.1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, as well as breaching Carrier One's contracts with Treadway. Now before the Court are Defendants' motion for summary judgment (Dkt. No. 112) and Treadway's motion for partial summary judgment (Dkt. No. 115), as well as Defendants' motion to strike Treadway's statement of facts and attorney's affidavit in support of his summary judgment motion (Dkt. No. 131). For the reasons that follow, Defendants' motion to strike is denied, and the parties' summary judgment motions are each granted in part and denied in part.[1]

---

[1] Treadway originally brought this lawsuit together with a co-Plaintiff, Cliff Niiranen. After the parties' motions for summary judgment were fully briefed, Niiranen settled with Defendants and, as a result, his claims were voluntarily dismissed. (*See* Dkt. No. 163.) Additionally, this case was filed as a putative class action. However, in a Memorandum Opinion and Order dated January 11, 2022, the Court found that both Niiranen and Treadway had waived their rights to bring any claims on behalf of a class and thus granted Defendants' motion to dismiss any such claims. (1/11/2022 Mem. Op. and Order at 11–18, Dkt. No. 52.)

**BACKGROUND**

I.      **Local Rule 56.1 and Defendants' Motion to Strike**

In response to Treadway's motion for summary judgment, Defendants assert that

Treadway's statement of facts does not comply with Northern District of Illinois Local Rule

56.1. For that reason, Defendants also separately filed a motion to strike Treadway's statement of

facts and the accompanying affidavit of one of Treadway's attorneys.

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of

material facts that it contends entitle it to summary judgment. L.R. 56.1(a)(2), 56.1(d). The

statement of facts "must consist of concise numbered paragraphs" and "[e]ach asserted fact must

be supported by citation to the specific evidentiary material . . . that supports it." L.R. 56.1(d)(1),

(2). The party opposing summary judgment must then file a response to the movant's statement.

L.R. 56.1(b)(2). The response should respond to each numbered paragraph in the moving party's

statement and, where the opposing party disputes a fact, it must include specific references to the

affidavits, parts of the record, or other supporting materials relied on to controvert that fact. L.R.

56.1(e). "Asserted facts may be deemed admitted if not controverted with specific citations to

evidentiary material." L.R. 56.1(e)(3). To the extent the opposing party wishes to present any

additional facts, it may do so by submitting a separate statement of additional facts that complies

with Local Rule 56.1(d), which also governs the moving party's statement of material facts. L.R.

56.1(b)(3). Then, the moving party must submit a response to those additional facts subject to the

requirements for the opposing party's response to the statement of material facts set forth in

Local Rule 56.1(e). L.R. 56.1(c)(2).

---

As a result, only Treadway's individual claims against Carrier One and Samarov remain in this case.
Those are the claims that are the subject to the instant motions.

According to Defendants, Treadway's Local Rule 56.1 submissions run afoul of Local Rule 56.1 in several ways. Their main objection is that the factual assertions in Treadway's submissions lack competent evidentiary support. Defendants' predominant complaint relates to the affidavit of one of Treadway's counsels, Rachel Smit ("Smit Affidavit"). Under Federal Rule of Civil Procedure 56(c)(4), an affidavit "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Defendants claim that the Smit has no personal knowledge of the events underlying this case, rendering her entire affidavit inadmissible. Thus, they contend that the Smit Affidavit should be stricken and ask that the Court disregard the factual assertions that rely on the affidavit for support.

Defendants' objection to the Smit Affidavit is wholly baseless. Notably, Treadway does not rely on the Smit Affidavit itself as substantive evidence supporting his factual assertions but instead uses it as a means of introducing documents and other evidence produced in discovery.[2] Introducing materials in the record through an authenticating affidavit is not required for purposes of summary judgment. *See, e.g.*, *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 931 (7th Cir. 2018) ("It is not unusual for parties to submit documentary evidence to support or oppose summary judgment . . . without fully authenticating the documents with affidavits thorough enough to overcome any and all evidentiary objections that could be raised."); *Cirves v. Syed*, No. 19-cv-725-jdp, 2022 WL 7458760, at *1 (W.D. Wis. Oct. 13, 2022) ("[F]ollowing the 2010

---

[2] Nearly all factual statements in Treadway's Local Rule 56.1 submissions cite directly evidence introduced through the Smit Affidavit rather than the affidavit itself. The only factual assertions that cite directly to the Smit Affidavit are those that set forth a damages-related figure that the affiant derived from the evidence. Even then, the cited portion of the Smit Affidavit itself cites to the evidence containing the data on which that figure is based.

amendment to Federal Rule of Civil Procedure 56, evidence submitted in support or opposition to summary judgment need not be authenticated." (internal quotation marks omitted)); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to ***particular parts of materials in the record*** . . . ." (emphasis added)). That is not to say that inadmissible evidence such as documents not capable of authentication can be considered at the summary judgment stage. *Collins Eng'rs, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 19-cv-01203, 2022 WL 20840940, at *1 (N.D. Ill. Mar. 29, 2022). But it is up to the party opposing that evidence to raise a proper objection. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *see also Fenje v. Feld*, 301 F. Supp. 2d 781, 811 (N.D. Ill. 2003) ("The moving party . . . need not explicitly set forth in its Local Rule 56.1[] statement the basis . . . for each piece of evidence being admissible nor need it anticipate and respond in advance to every possible objection that might be raised to the admissibility of a piece of evidence."). Absent objection, "the Court can consider unauthenticated documents on motions for summary judgment if it appears that they are capable of authentication at trial." *Collins*, 2022 WL 20840940, at *1 (internal quotation marks omitted).

Here, Defendants make no specific challenge to the authenticity of any piece of evidence introduced by the Smit Affidavit. Rather, Defendants assert that the affiant does not have personal knowledge of the documents sought to be introduced as evidence and can only attest that she had personal knowledge from her review of discovery that each piece of evidence was produced in the litigation. Yet the reason that the affiant claims personal knowledge based on her review of discovery is because "[d]ocuments produced by an opponent during discovery may be treated as authentic." *Fenje*, 301 F. Supp. 2d at 809. Given that Defendants neither deny that any

piece of evidence was produced during discovery nor dispute any document's authenticity, the Court is satisfied that all of Treadway's evidence supporting his Local Rule 56.1 submissions is capable of authentication at trial. *See id.* at 789 ("Even if a party fails to authenticate a document properly or to lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic."). To the extent Defendants dispute any of Treadway's factual assertions based solely on their objection to the Smit Affidavit, the Court will treat that factual assertion as admitted.

Another of Defendants' objections to the adequacy of Treadway's supporting evidence faults certain factual assertions for citing the admissions in Defendants' answer to the operative First Amended Complaint. It is true that factual statements supported only by citation to unverified pleadings generally do not provide a factual predicate in support of or opposition to summary judgment. *E.g.*, *Mack v. City of Chicago*, No. 16 C 7807, 2019 WL 1331786, at *4 (N.D. Ill. Mar. 25, 2019). As evidenced by the plain language of Rule 56, however, a party may support a motion for summary judgment by citing "admissions." Fed. R. Civ. P. 56(c)(1)(B); *see, e.g.*, *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) ("When a party in a lawsuit makes an admission in its pleadings or in its answer to a request for admissions, it makes a judicial admission that can determine the outcome of that lawsuit."). Thus, if a defendant's "Answer admitted a fact, then that fact is fair game at summary judgment." *DuBose v. Ferrera Candy Co.*, No. 22 CV 7147, 2024 WL 2088201, at *2 (N.D. Ill. May 9, 2024). Worse than Defendants' misapprehension of the "well-settled rule that a party is bound by what it states in its pleadings," *Help At Home Inc. v. Medical Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001), is the fact that Defendants respond to all of Treadway's factual assertions citing to the answer with one word: "Admit." (Defs.' Revised Resp. to Pl.'s Statement of Facts in Supp. of Mot. for Partial

Summ. J. ("DRPSF") ¶¶ 1–6, 9–10, Dkt. No. 151.) The Court finds Defendants' subsequent request to strike those twice-admitted factual assertions to be not merely mistaken but frivolous.

Finally, Defendants argue that certain of Treadway's factual assertions are conclusory, argumentative, and unsupported. For many of the accused factual assertions, the Court fails to see the claimed impropriety. (*See* DRPSF 16, 18–19, 55, 57, 78.) None are blatantly argumentative.[3] Each is supported with a citation to the record, and Defendants' response does not address why the cited evidence fails to support the factual assertion. To the extent that any factual assertion is problematic, the issue does not warrant striking any part of Treadway's Local Rule 56.1 submissions.

As Defendants recognize in their motion to strike, the purpose of Local Rule 56.1 "is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). Defendants' unfounded and baseless objections run counter to this purpose and unnecessarily complicate what should have been a relatively straightforward inquiry into whether there is a genuine dispute regarding Treadway's factual assertions. This Court is not "required to wade through improper denials . . . in search of a genuinely disputed fact." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). In sum, Defendants' motion to strike is denied, and the Court deems admitted all of Treadway's factual assertions that Defendants do not squarely controvert with specific evidence in the record.

---

[3] There is one factual assertion that might be considered argumentative due to its description of Carrier One as acting "indiscriminately" (DRPSF ¶ 78), but that factual assertion is no longer material to this case as it concerns the co-Plaintiff whose claims have since been voluntarily dismissed.

## II.     Factual Background

Subject to the above considerations, the facts summarized below are undisputed.

Carrier One is an over-the-road flatbed transportation services company that transports freight—predominantly steel, building materials, and heavy equipment. (DRPSF ¶ 1.) Carrier One has received authority from the U.S. Department of Transportation to operate as a motor carrier. (*Id.* ¶ 2.) Ivan Samarov is both the president and the owner of Carrier One. (DRPSF ¶ 10; Pl.'s Corrected Resp. to Def.'s Statement of Material Facts in Supp. of Mot. for Summ. J. ("PRDSF") ¶ 40, Dkt. No. 157.) Through January 2020, Carrier One was headquartered and had its principal place of business in Alsip, Illinois. (DRPSF ¶¶ 5–6; PRDSF ¶¶ 42–43.) In January 2020, Carrier One moved its headquarters to Lake County, Indiana, where it remains. (DRPSF ¶ 9; PRDSF ¶ 42.)

While Carrier One directly employed about 26 to 32 employees, it independently contracted with all the drivers it hired to transport its customers' freight. (DRPSF ¶¶ 3, 7; PRDSF ¶¶ 44–45.) One of those drivers was Robert Treadway. (DRPSF ¶ 4; PRDSF ¶ 24.) Before Treadway began driving for Carrier One, he attended an orientation for new drivers at Carrier One's then-headquarters in Illinois. (DRPSF ¶¶ 13, 15; PRDSF ¶ 48.) At the orientation, Treadway and other new Carrier One drivers learned about Carrier One's policies, procedures, and rules; met with their assigned fleet managers; and completed the company's standard paperwork. (DRPSF ¶¶ 16–17.) Because Treadway did not own his own truck, he also attended an orientation session where Carrier One arranged for him to lease a truck from Impel Union, a truck leasing company. (DRPSF ¶ 18; PRDSF ¶ 27; Defs.' Resp. to Pl.'s Statement of Additional Facts in Opp'n to Defs.' Mot. for Summ. J. ("DRPSAF") ¶ 2, Dkt. No. 143.) He subsequently entered into an agreement to lease a truck from Impel Union ("Truck Lease"). (PRDSF ¶ 27.) Then, to use that truck in his work for Carrier One, Treadway entered into lease agreements with

Carrier One under which Carrier One leased the truck from Treadway. (DRPSF ¶¶ 19–20; PRDSF ¶ 24.)

On August 16, 2017, Treadway and Carrier One entered into an Independent Contractor Equipment Lease Agreement ("2017 Lease"[4]), which was a standard form lease. (DRPSF ¶ 20; PRDSF ¶ 24; Smit Aff., Ex. 8, 2017 Lease, Dkt. No. 117-8.) The 2017 Lease includes Schedules A, B, and C. (DRPSF ¶ 20.) Relevant here, Schedule B provides details regarding how Treadway would be compensated and Schedule C specifies Treadway's and Carrier One's respective insurance obligations. (DRPSF ¶¶ 22–23; PRDSF ¶¶ 25–26, 30, 53.) The terms of the 2017 Lease governed Treadway's relationship with Carrier One through October 2019. (DRPSF ¶ 64; PRDSF ¶ 24.) On October 3, 2019, Treadway and Carrier One entered into a new Independent Contractor Equipment Lease Agreement with revised terms ("2019 Lease"). (DRPSF ¶¶ 64–69.) As with the 2017 Lease, the 2019 Lease includes a Schedule B detailing Treadway's compensation and a Schedule C addressing the parties' insurance obligations. (DRPSF ¶¶ 65–66, 69; Smit. Aff., Ex. 28, 2019 Lease, Dkt. No. 117-28.) In addition, the 2019 Lease includes an Addendum Pertaining to Equipment Lease Charges & Deduction Authorization ("Addendum to 2019 Lease"), which authorizes Carrier One to deduct from Treadway's compensation certain sums to be transferred to Impel Union. (DRPSF ¶ 68; 2019 Lease at C-001524–25.)

While Treadway worked for Carrier One, he received settlement statements setting out how Carrier One calculated Treadway's compensation for the work he performed in a particular

---

[4] Treadway and Carrier One executed another Independent Contractor Equipment Lease Agreement on January 26, 2018. (PRDSF ¶ 24.) Because the material terms of that agreement are substantially similar to the one Treadway executed in August 2017, for simplicity, the Court refers to both as the 2017 Lease. (*Compare* Smit Aff., Ex. 8, 2017 Lease, Dkt. No. 117-8, *with* Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J., Ex. 13 to Ex. B, Jan. 26, 2018 Independent Contractor Equipment Lease Agreement, Dkt. No. 114-2.)

week. The settlement statements first list the settlement for each individual load that Treadway had hauled in that week. (DRPSF ¶¶ 24–26.) An individual load's settlement begins with a top line with columns for "Gross Pay," the 80% rate, and net pay. (DRPSF ¶¶ 24–25; Smit Aff., Ex. 10, Treadway Settlement Statements, Dkt. No. 117-10.) Net pay was equal to 80% of the listed gross pay. Following the net pay line, an individual load settlement has a subsection for "Order Deductions/Earnings," which lists individual deductions subtracted from and earnings added to the net pay for that particular load. (DRPSF ¶ 26; Treadway Settlement Statements.) The final line of an individual load settlement states the "ORDER TOTAL," summing the net pay, deductions, and earnings for the individual load. (Treadway Settlement Statements.) Following the individual load settlements are separate sections for "Tractor Deductions/Earnings," "DEDUCTIONS," and "REIMBURSEMENTS." (DRPSF ¶ 30; Treadway Settlement Statements.) At the end of the week's settlement statement is a final figure representing Treadway's overall compensation for his work that week. (Treadway Settlement Statements.)

On November 18, 2020, Carrier One terminated Treadway as its driver. (DRPSF ¶ 80; PRDSF ¶ 38.) Following his termination, Treadway retained possession of the truck he had leased from Impel Union, used that truck in his work for a new employer, and continued to make payments on the Truck Lease. (PRDSF ¶¶ 28–29.)

Around the same time as his termination, Treadway brought this lawsuit alleging that Defendants failed to pay him all the compensation he was owed under the 2017 Lease and the 2019 Lease. Count I of the First Amended Complaint (Dkt. No. 30) claims that both Defendants violated the IWPCA by taking unlawful deductions from Treadway's compensation. In Count II, Treadway asserts a breach of contract claim against both Defendants for failing to compensate

him as promised under the 2017 Lease and the 2019 Lease. Count III is asserted against Carrier One only and alleges that it violated multiple Truth-in-Leasing regulations.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, there is substantial overlap between the Truth-in-Leasing and IWPCA issues on which Treadway seeks partial summary judgment and the arguments in Defendants' motion for summary judgment as to all three of the First Amended Complaint's Counts. In the case of cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

### I.      Truth-in-Leasing Regulations

Under 49 U.S.C. § 14102(a)(4), the U.S. Department of Transportation has the authority to "issue regulations governing the lease of vehicles between authorized carriers and owner[]-operators"— "owner-operators" meaning "trucker drivers who own their trucks and lease them to shippers or authorized carriers." *Shimko v. Jeff Wagner Trucking, LLC*, No. 11-cv-831-wmc, 2013 WL 10075919, at *2 (W.D. Wis. June 28, 2013). The Truth-in-Leasing regulations, 49 C.F.R. § 376 *et seq.*, were promulgated pursuant to that statutory authority. Their purpose is "to promote full disclosure between the carrier and owner-operator in the leasing contract, to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry, and to eliminate or reduce opportunities for skimming and other illegal

practices." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 678 (7th Cir. 2022) (quoting Lease and Interchange of Vehicles, 43 Fed. Reg. 29812, 291812 (July 11, 1978)).

Relevant here, "49 C.F.R. § 376.12 requires that federally regulated motor carriers include certain provisions in their leases with independent owner-operators and adhere to and perform these provisions." *Brinker v. Namcheck*, 577 F. Supp. 2d 1052, 1060 (W.D. Wis. 2008) (internal quotation marks omitted). Treadway's First Amended Complaint alleges that Carrier One violated multiple of those Truth-in-Leasing regulations and he seeks summary judgment as to certain of the claimed violations.[5] On the other hand, Defendants contend the Court should enter summary judgment finding Carrier One not liable for any Truth-in-Leasing violation.

### A.     Actual Damages

Before addressing the individual alleged violations, the Court considers Defendants' contention that Treadway has failed to establish that he suffered actual damages as a result of any of the alleged Truth-in-Leasing violations. Under 49 U.S.C. § 14704(a)(2), which supplies the private right of action for Truth-in-Leasing violations, a carrier is "liable for damages sustained by a person as a result of an act or omission of that carrier . . . in violation of this part." In their earlier motion to dismiss for failure to state a claim, Defendants argued that the Truth-in-Leasing claim must be dismissed for failing to plead actual damages. While this Court agreed that "[r]equiring actual damages is consistent with the language of § 14704(a)(2)," it found at the pleading stage that the First Amended Complaint adequately alleged that Carrier One's Truth-in-

---

[5] It is not entirely clear which Truth-in-Leasing violations alleged in the First Amended Complaint are not addressed in Treadway's motion for partial summary judgment. His motion notes only that he has "alleged other [Truth-in-Leasing] regulations in the First Amended Complaint" and "reserve[s] his] right to pursue additional [Truth-in-Leasing] violations at trial." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 3 n.2, Dkt. No. 115.)

Leasing violations resulted in actual damages. *Niiranen v. Carrier One, Inc.*, No. 20-cv-06781, 2022 WL 103722, at *5 (N.D. Ill. Jan. 11, 2022).

 Defendants now contend that, to the extent Treadway can establish that Carrier One violated any Truth-in-Leasing regulation, they would still be entitled to summary judgment because the record reveals no evidence that any violation caused Treadway actual damages. According to Defendants, for Treadway to prove that he suffered actual damages, he must show detrimental reliance. Specifically, a plaintiff's evidence must "show that they suffered a loss because they relied on an inaccurate or incomplete disclosure," or, put another way, that "but for the violation, [they] would have made different choices, and, thereby, saved money.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1325–26 (11th Cir. 2010) (internal quotation marks omitted). Because the evidence here fails to demonstrate such detrimental reliance on Treadway's part, Defendants argue, they are entitled to summary judgment on the entirety of his Truth-in-Leasing claim for want of actual damages.

 Although the Court agrees that proof of actual damages from a Truth-in-Leasing violation will usually entail a showing of detrimental reliance, the Court cannot find that this will always be the case. To be sure, Treadway cannot demonstrate his actual damages by "simply pointing to [Carrier One's] undisclosed profits" but must instead "show how [he] sustained damages because of the violations." *Landstar*, 622 F.3d at 1325. As this Court previously observed, actual damages may be shown where "the carrier's Truth-in-Leasing violations resulted in [the owner-operator] being underpaid." *Niiranen*, 2022 WL 103722, at *5; *see also Hill v. Cargo Runner Co.*, No. 22-CV-00910, 2023 WL 6213674, at *11 (N.D. Ill. Sept. 25, 2023) (finding that an owner-operator's injury and actual damages can be shown from "the loss of money"). Thus, to prove actual damages, Treadway's evidence must establish a causal relationship between the

particular Truth-in-Leasing violation and his underpayment. *See Owner-Operator Indep. Drivers Ass'n v. Landstar Sys., Inc.*, No. 3:02-cv-1005-J-25MCR, 2012 WL 6827463, at *7 (M.D. Fla. Aug. 30, 2012) (explaining that the detrimental-reliance requirement can be satisfied with evidence "establishing a causal link between [the defendant's] noncompliance with [the particular Truth-in-Leasing regulation] and [the owner-operator's] damages."). He must then prove the amount necessary "to put [him] in the same position [he] would have occupied had [Carrier One's] wrongdoing not occurred." *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 288 F. Supp. 2d 895, 906 (S.D. Ohio 2003).

Given that the Truth-in-Leasing regulations largely impose disclosure requirements upon motor carriers, an owner-operator's injury from a violation typically comes from the financial harm they suffered from their reliance on an inaccurate or incomplete disclosure. *Landstar*, 622 F.3d at 1326; *see also Derolf v. Risinger Bros. Transfer Inc.*, 259 F. Supp. 3d 876, 886 (C.D. Ill. 2017) (explaining that, to plead actual damages, the alleged financial harm must be "attributable to an[] alleged deficiency in the transparency of the lease terms"). Other statutes imposing notice and disclosure rules likewise require actual damages be proved with evidence of detrimental reliance. *E.g.*, *Nevarez v. O'Connor Chevrolet, Inc.*, 303 F. Supp. 2d 927, 934 (N.D. Ill. 2004) ("In order to recover actual damages under [the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*], a plaintiff must establish a causal connection between the inaccurate disclosure and her injury by demonstrating that she relied on the inaccurate disclosure and thereby was effectively prevented from obtaining better credit terms elsewhere." (internal quotation marks omitted)). And the *Landstar* case that Defendants cite in support of a detrimental-reliance requirement involved disclosure violations. *Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*, No. 2:02-CV-950 TS, 2013 WL 588893, at *8 (D. Utah Feb. 11, 2013).

13

Yet not all the Truth-in-Leasing regulations impose pure disclosure requirements. Some mandate that leases contain certain substantive provisions that "shall be adhered to and performed by the authorized carrier." 49 C.F.R. § 376.12. For example, § 376.12(k) provides that where a lease requires an escrow fund, it must provide that "while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund" and "shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination." 49 C.F.R. § 376.12(k)(5), (6). While requiring proof of detrimental reliance "makes sense in the context of disclosure violations, it does not make sense in the case of [§ 376.12(k)] escrow violations." *C.R. England*, 2013 WL 588893, at *8. This Court therefore previously recognized that Treadway had a cognizable claim for "actual damages from Carrier One's failure both to pay interest on its escrow deductions and then return those deductions in full after [Treadway] stopped working for it." *Niiranen*, 2022 WL 103722, at *5.

Even as to disclosure violations, the Court does not agree with Defendants insofar as they suggest that Treadway must affirmatively demonstrate what he would have done differently had Carrier One complied with the particular Truth-in-Leasing regulation. Again, the focus is on whether and how the regulatory violation caused Treadway financial harm. If a carrier uses an omitted disclosure as cover for an underpayment, the owner-operator has experienced actual damages. *Cf. Brant*, 43 F.4th at 679 (finding that actual damages were adequately pleaded where the plaintiff alleged that the defendant's failure to make required disclosures "prevented him from contesting the alleged underpayment"); *Hill*, 2023 WL 6213674, at *12 ("[T]he Complaint not only alleges violations based upon improper disclosures, but it also alleges that Defendant, in fact, charged Plaintiffs a higher amount than specified in the Lease Agreements. Such overcharges, if true, sufficiently establish actual damages."). In such a case, there is no good

reason to insist that the owner-operator introduce evidence of how he would have acted in a counterfactual scenario where he had access to the information necessary to detect his underpayment. Rather, it is enough that, "as a result of [the] violation, [Treadway was] underpaid—that is, had [Treadway] received accurate [disclosures] from [Carrier One] and compared them to what [he was] actually paid, [he] would have seen that [he] had been underpaid and been in a position to demand more money." *Cervantes v. CRST Int'l, Inc.*, No. 20-CV-75 CJW-KEM, 2022 WL 22836508, at *7 (N.D. Iowa Aug. 16, 2022).

Ultimately, Treadway must prove each of the alleged Truth-in-Leasing violations and then show his actual damages with respect to each individual established violation. *Cf. Hill*, 2023 WL 6213674, at *11 (holding that a Truth-in-Leasing claim "must plausibly allege actual damages as to each alleged violation"). Whether a particular regulatory violation has actually damaged Treadway may well vary based on the nature of the violation and the facts. Accordingly, the Court will conduct a violation-by-violation analysis of Treadway's proof of actual damages, subject to the above considerations.

## B. Clear Specification of Compensation

Treadway argues that both the 2017 Lease and the 2019 Lease fail to specify clearly his compensation, in violation of 49 C.F.R. § 376.12(d). Under § 376.12(d), "[t]he amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease" and may be expressed in multiple ways, including "as a percentage of gross revenue." The Court addresses Treadway's contention first as to the 2017 Lease and then as to the 2019 Lease.

### 1. 2017 Lease

Schedule B to the 2017 Lease states that "Compensation shall be 80% of the gross revenue for all loads, paid Friday for all paperwork delivered the preceding Monday." (DRPSF

¶ 21.) Because the 2017 Lease provides for Treadway to be compensated based on a percentage of gross revenue, Carrier One was also required to comply with § 376.12(g). Specifically, under that Truth-in-Leasing regulation:

> When a lessor's [*i.e.*, driver or owner-operator] revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill.

49 C.F.R. § 376.12(g). "This disclosure requirement protects owner-operators from unscrupulous carriers who might be tempted to hide such information, to underpay for the shipment, and to pocket the difference. Without the requirement that this information be made available before settlement, drivers . . . might never know if they were being underpaid." *Brant*, 43 F.4th at 679.

### a.     Violations

Despite basing Treadway's compensation on gross revenue, nowhere does the 2017 Lease actually define gross revenue. Treadway contends that creates uncertainty as to the meaning of gross revenue in the 2017 Lease, which violates § 376.12(d)'s command that the lease clearly state the amount of pay to which a driver is entitled.

Multiple courts have found that, where a lease expresses a driver's compensation as a percentage of gross revenue, the carrier's failure to "clearly explain how [it] arrives at its figure for gross revenue" violates § 376.12(d). *Cunningham v. Lund Trucking Co.*, 662 F. Supp. 2d 1262, 1272 (D. Or. 2009); *see also Owner-Operator Indep. Drivers Ass'n v. Bulkmatic Transp. Co.*, 503 F. Supp. 2d 961, 969–70 (N.D. Ill. 2007) (finding a violation of § 376.12(d) where "the Lease does not define 'gross revenue' nor does it specifically state which items, if any, may be excluded from gross revenue before calculating owner-operator compensation"). This Court agrees that the 2017 Lease is ambiguous as to the meaning of gross revenue.

In response, Defendants assert that Carrier One explained to its drivers the meaning of gross revenue at their orientation and points to the materials that it provided its drivers making clear that gross revenue meant "everything, the total revenue for one particular load that has been invoiced." (PRDSF ¶ 45; Pl.'s Corrected Resp. to Defs.' Statement of Additional Facts in Opp'n to Pl.'s Mot. for Partial Summ. J. ("PRDSAF") ¶¶ 23, 25, 32–33, 38, Dkt. No. 155.) Yet Carrier One's reliance on extrinsic evidence of its efforts to advise owner-operators on the meaning of gross revenue simply underscores the failure of the 2017 Lease to comply with § 376.12(d)'s plain language requirement that the driver's compensation be clearly stated on the face of the lease or in the attached Schedule B addendum. *Cunningham*, 662 F. Supp. 2d at 1272 ("While Lund has asserted that she explained how [the defendant] compensates owner-operators, her oral explanation does not satisfy the Truth-in-Leasing requirement that compensation 'be clearly stated on the face of the lease.'" (quoting 49 C.F.R. § 376.12(d))).

In addition, Treadway contends that Carrier One failed to comply with § 376.12(g) by including in the 2017 Lease a provision making clear that Treadway had a right to receive a rated freight bill and by failing actually to provide Treadway with a freight bill or a document with all the information normally contained in a freight bill. The 2017 Lease unquestionably runs afoul of this regulation, given the absence of a provision entitling Treadway to the receipt of a freight bill. (DRPSAF ¶ 7.) Nor did Carrier One provide Treadway with a freight bill before or at the time of settlement. (DRPSF ¶ 49.)

### b. *Damages*

Having determined that the 2017 Lease fails to clearly state Treadway's compensation on its face, the Court turns to consider the damages Treadway asserts that he sustained as a result of that violation. Both Treadway and Defendants seek summary judgment as to Treadway's claim

for damages resulting from Carrier One's retention of a portion of the fuel surcharge it charged to clients. In addition, both seek summary judgment as to Treadway's request for reimbursement of undisclosed commissions that Carrier One paid to a load broker.

i.    Fuel Surcharge

For certain clients, Carrier One would invoice them for a fuel surcharge.[6] Then, in the Order Deductions/Earnings subsection for that load's settlement, the fuel surcharge was included as an earning added to the driver's net pay. (DRPSF ¶ 26.) Yet even though the fuel surcharge is listed separately and not included in the overall "Gross Pay" figure to which the 80% rate is applied, Treadway received only 80% of the amount Carrier One billed to its clients for the fuel surcharge. (*Id.* ¶¶ 26–27.) Treadway contends that Carrier One's failure to clearly specify his compensation allowed Carrier One wrongfully to retain 20% of the fuel surcharge, thereby resulting in Treadway being underpaid.

Despite his claim to suffering an actual injury from Carrier One's retention of 20% of the fuel surcharge, Treadway fails to demonstrate that he had any entitlement to 100% of the fuel surcharge under the 2017 Lease. Instead, Treadway can only claim that, because the settlement statements list the fuel surcharge as an earning separate from the gross pay figure, this somehow means that the fuel surcharge should not be treated as gross revenue subject to the 80% rate prescribed in Schedule B. The Court does not agree.

As discussed above, the phrase "gross revenue" in the 2017 Lease is ambiguous. Under the "generally accepted meaning of the phrase," gross revenue is generally understood "to mean the total amount charged to the shipper on the invoice for a shipment." *Bulkmatic*, 503 F. Supp.

---

[6] Neither Treadway nor Defendants fully explain what a fuel surcharge is. Another district court has described the fuel surcharge billed by the authorized carrier in that case as an amount billed to the shipper-customer to account for an increase in fuel prices. *Bulkmatic*, 503 F. Supp. 2d at 965.

2d at 972; *see also Elda Arnhold & Byzantio, LLC v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 701 (7th Cir. 2002) (identifying "trade usage in the relevant industry" as extrinsic evidence that can be considered in resolving a contractual ambiguity). The Court believes that is the best way to interpret the 2017 Lease's use of "gross revenue." *See Bulkmatic*, 503 F. Supp. 2d at 972 (adopting the generally understood meaning of "gross revenue").[7] Since the fuel surcharge was part of what was invoiced to the customer, it was not wrongful for Carrier One also to subject it to the 80% rate as part of gross revenue. Because Carrier One's retention of 20% of the fuel surcharge caused Treadway no actual damages, the Court grants Defendants' motion for summary judgment and denies Treadway's motion as to the fuel-surcharge claim.

ii.     Broker Commissions

Until 2019, Carrier One employed a team of customer-service representatives who would assist its drivers in finding and booking loads. (DRPSF ¶ 42.) Around April 2019, Carrier One eliminated its customer-service team, and those representatives were hired by another entity owned by Samarov, Sarisa Freight Solutions ("Sarisa"). (*Id.* ¶ 51.) Carrier One then hired Sarisa to broker loads for its drivers. (PRDSAF ¶¶ 9, 12.) After Sarisa was hired as Carrier One's broker, Carrier One began invoicing Sarisa for a brokered load at an amount less than what Carrier One's customer paid for the shipment, with the difference representing Carrier One's payment to Sarisa for its services. (DRPSF ¶¶ 58–59.) Typically, Sarisa was paid about 8% of the sum paid by the shipper-customer for the load. (*Id.* ¶ 59.) In turn, Carrier One paid Treadway 80% of the sum invoiced to Sarisa as opposed to the sum paid by the shipper-customer. (*Id.*

---

[7] To prove that Carrier One did not intend for gross revenue to encompass the fuel surcharge, Treadway highlights language in a Mutual Expectations Agreement Carrier One presented to drivers. (Smit. Aff., Ex. 6, Dkt. No. 117-6.) However, the evidence submitted to the Court was signed by the now-dismissed co-Plaintiff, Niiranen, and does not suffice to demonstrate a mutual understanding between Carrier One and Treadway.

¶ 60.) Put another way, Sarisa's commission was taken out from the figure represented to Carrier One drivers as the gross revenue for a load. (*Id.*) Yet Carrier One never informed its drivers of this change to its billing practices. (*Id.* ¶ 61.)

Treadway contends that Sarisa was a mere alter ego of Carrier One composed of former Carrier One employees performing the same services as before and accuses Carrier One of using Sarisa as a means of skimming revenue from its drivers' pay. For that reason, Treadway claims he suffered damages due to Carrier One taking the so-called commissions paid to Sarisa out of his compensation without his knowledge.

While Treadway and Defendants disagree as to whether Sarisa is an alter ego of Carrier One, the Court does not need to resolve that question to find actual damages under the 2017 Lease. Regardless of whether Sarisa was an alter ego or a true third-party broker, the 2017 Lease did not allow Carrier One to take broker commissions out of Treadway's compensation. Under the interpretation of gross revenue adopted above, the gross revenue figure consists only of the total amount charged to the ***shipper***. That was how Treadway was paid until Sarisa took over Carrier One's customer-service work. And the undisputed evidence shows that the shipper was invoiced more for a Sarisa-brokered load than the amount represented as gross revenue for that load on Treadway's settlement statements. Further, nowhere does the evidence reveal that Carrier One clearly disclosed to its drivers that it would change its previous practice of using the shipper's full payment on a load as the gross revenue figure by deducting Sarisa's commissions from that sum. The Court therefore concludes that Carrier One's violations of § 376.12(d) and (g) allowed it to underpay drivers without their knowledge. *See Piquion v. Amerifreight Sys. LLC*, No. 22 C 5690, 2023 WL 8113379, at *13 (N.D. Ill. Nov. 22, 2023) ("Section 376.12(g)

exists for th[e] very purpose [of] prevent[ing] motor carriers from underpaying drivers while ensuring they are never the wiser.").

Because Treadway has demonstrated that he was actually damaged by Carrier One's subtraction of Sarisa's broker commissions from the sum it represented to Treadway as gross revenue, the Court finds that Treadway is entitled to summary judgment in his favor with respect to Treadway's Truth-in-Leasing claim arising from the Sarisa commissions during the time he was working under the 2017 Lease. At this time, however, the Court cannot determine as a matter of law the amount of Treadway's damages from this particular violation because Treadway's evidence supports only a combined damages figure for both Treadway and his former co-Plaintiff and also does not distinguish between damages incurred under the 2017 Lease and 2019 Lease.

### 2. *2019 Lease*

In contrast with the relatively succinct Schedule B to the 2017 Lease, Schedule B to the 2019 Lease provides substantially more details regarding the calculation of Treadway's compensation. Whereas the 2017 Lease compensated Treadway based on gross revenue, the 2019 Lease provides that Treadway would receive 80% of "linehaul revenue," and gives extensive detail as to the meaning of that term. (DRPSAF ¶ 12; 2019 Lease at 22.) Despite the 2019 Lease providing more fulsome details as to driver compensation, Treadway asserts that it still fails to state clearly his compensation in light of Carrier One's continued payment of commissions to Sarisa.

Notably, in defining "linehaul revenue," the 2019 Lease states that the figure "means all revenue billed by CARRIER ONE" to a shipper-customer subject to several subtractions, including "amounts CARRIER ONE paid to Third Parties . . . including but not limited to fees or commissions . . . paid to brokers." (*Id.*) Thus, on its face, the 2019 Lease allows Carrier One to

do what it was not permitted to do under the 2017 Lease—subtract broker commissions from the linehaul revenue against which the 80% compensation rate is applied. Nonetheless, Treadway asserts that because Sarisa is an alter ego of Carrier One, and not a true third-party broker, the 2019 Lease does not clearly state his compensation because it fails to reveal that Carrier One is essentially paying itself to broker its driver's loads.

The claimed Truth-in-Leasing violation here hinges on whether Treadway can prove that Sarisa and Carrier One are one and the same. However, because neither Treadway nor Defendants adequately develops their argument as to Sarisa's alter-ego status, the Court denies summary judgment to both with respect to the broker commissions under the 2019 Lease. First, Defendants rely on caselaw applying a federal common law analysis to argue the point, while Treadway contends that Illinois law governs. Neither Defendants nor Treadway make more than a perfunctory argument as to why their chosen law is the correct one. To the extent Treadway is correct that the alter-ego analysis is governed by state law, he incorrectly assumes that Illinois law applies. But "Illinois follows the internal affairs doctrine as its choice-of-law principle in cases alleging impropriety of corporate governance," and that doctrine points to "the substantive law of the state of incorporation." *Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1000 (N.D. Ill. 2001). Because Carrier One was incorporated in Delaware (PRDSF ¶ 42), Delaware law rather than Illinois law would govern whether Sarisa was an alter ego of Carrier One. As a final point, the Court notes that neither Treadway nor Carrier One sufficiently demonstrates the absence of a genuine dispute of fact as to Sarisa's alter-ego status regardless of which test applies.

### C. Undisclosed Chargebacks—2017 Lease

Under 49 C.F.R. § 376.12(h), "[t]he lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's

compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed." Treadway claims that Carrier One violated this provision by failing to disclose in the 2017 Lease how it charged him for fuel purchased with a Carrier One-provided fuel card.

The 2017 Lease makes the owner-operator "fully responsible for any and all costs, fees and expenses incurred in connection with" the operation of his truck, including "fuel." (PRDSF ¶ 33; 2017 Lease § 6(b).) At the same time, Carrier One received fuel discounts from various truck stops and then provided its drivers with a fuel discount card allowing them to benefit from its discounted rate. (PRDSF ¶ 46; PRDSAF ¶ 21.) When Treadway used his Carrier One-provided fuel discount card to purchase fuel, the cost of the purchased fuel would appear as a deduction on his settlement statement along with a $0.50 transaction fee. (DRPSF ¶ 28; PRDSAF ¶ 17.) Then, once per month, Carrier One included a fuel rebate on Treadway's settlement statement passing on a portion of the discount that Carrier One received for fuel purchased using the discount card. (DRPSF ¶¶ 29, 31; PRDSAF ¶ 21.)

Treadway contends that Carrier One's practices around the chargeback of fuel purchased using its fuel discount card violated § 376.12(h). First, he notes that the 2017 Lease does not list fuel purchases as a chargeback item. Further, Treadway asserts that the 2017 Lease fails to disclose that he would be assessed a $0.50 per purchase transaction fee for fuel purchased using a Carrier One fuel discount card. Finally, Treadway faults Carrier One for not making clear in the 2017 Lease that it was not passing on the full amount of its fuel discount to the owner-operator.

The Court finds that Treadway has shown a straightforward violation of § 376.12(h) with respect to his purchases on the Carrier One fuel discount card. Because Treadway's purchase of

fuel using the fuel discount card was credited to Carrier One, not Treadway, it was Carrier One that made each fuel purchase initially and then deducted it from Treadway's compensation in the settlement statement. Nowhere does the 2017 Lease mention the fuel discount card or fuel chargebacks.

Although Treadway has shown Carrier One's violation of § 376.12(h), it is equally straightforward that Treadway suffered no actual damages as a result of Carrier One's undisclosed chargeback of fuel purchased on its fuel discount card. On the contrary, the undisputed facts show that Treadway saved money from his use of the fuel discount card. Treadway was not required to use Carrier One's fuel discount card and could have used his own credit card to purchase fuel, but then he would not have received any discount on the purchase. (PRDSAF ¶¶ 20–21.) That Carrier One assessed a small $0.50 transaction fee and retained a portion of the fuel discount for itself does not prove Treadway was damaged by the Truth-in-Leasing violation. *See Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 632 F.3d 1111, 1122 (9th Cir. 2011) ("Plaintiffs cannot prove damages simply by showing that [the carrier] sometimes charged more than its actual costs for charge-backs."); *C.R. England*, 508 F. Supp. 2d at 981–82 ("[C]harge-backs that include profits and fees are not *per se* unlawful under § 376.12(h); the Regulations do not preclude Defendant from making a profit.").

Because the 2017 Lease made Treadway solely responsible for his fuel costs, he benefitted from paying less for fuel charged to Carrier One's fuel discount card than what he otherwise would have paid using his own credit card. Given that benefit, Treadway cannot show actual damages simply because Carrier One also enjoyed some undisclosed benefit from his use of the fuel discount card. For that reason, the Court grants summary judgment in favor of Carrier

One on Treadway's Truth-in-Leasing claim based on the 2017 Lease's failure to provide disclosures relating to the fuel discount card.

### D. Disclosed Chargebacks—2017 Lease

Schedule B to the 2017 Lease lists various deductions that Treadway agreed to have taken from his compensation. (DRPSAF ¶ 15; 2017 Lease at 14.) Defendants agree that those deductions are properly considered chargebacks but, because the deductions were properly disclosed in the 2017 Lease, Defendants seek summary judgment as to them. (Treadway does not move for summary judgment as to these items.)

Treadway does not deny that the chargebacks listed in the 2017 Lease comply with § 376.12(h)'s requirement that chargebacks be clearly specified. Nonetheless, he contends that the chargebacks run afoul of § 376.12(h) because the 2017 Lease provides no details as to how the amount for each chargeback was computed. This is a violation, notwithstanding the fact that the 2017 Lease states the amount of the chargeback or the rate at which the chargeback would be assessed. *See Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc.*, 757 F. Supp. 2d 443, 455 (D.N.J. 2010) ("Courts have found that, even if the name and amount of the charge-back is listed, the method by which the amount of the charge-back is computed is an essential component in fulfilling the requirements of 49 C.F.R. § 376.12(h).").

Despite the disclosure issues with the chargebacks in the 2017 Lease, Defendants are entitled to summary judgment due to Treadway's failure to show a genuine dispute of fact as to his damages. Only with respect to the 2017 Lease's charges for occupational-accident insurance, registration, and e-logs does Treadway assert damages in the form of undisclosed markups. (DRPSAF ¶ 17.) Yet Treadway's evidence that those items included markups is the 2019 Lease's disclosure of markups as to those items. (*Id.*) The Court cannot find a genuine dispute of fact based solely on Treadway's speculation that the 2017 Lease's chargeback of those items must

have included a markup based on the 2019 Lease's disclosure of markups. Thus, the Court grants

summary judgment in Defendants' favor with respect to the 2017 Lease's disclosed deductions.

### E. Insurance Disclosures

Treadway contends that both the 2017 Lease and the 2019 Lease failed to comply with

the Truth-in-Leasing regulation pertaining to insurance. In particular, § 376.12(j) states as

follows:

> (1) The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCA regulations under 49 U.S.C. 13906. The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

> (2) If the lessor purchases any insurance coverage for the operation of the leased equipment from or through the authorized carrier, the lease shall specify that the authorized carrier will provide the lessor with a copy of each policy upon the request of the lessor. Also, where the lessor purchases such insurance in this manner, the lease shall specify that the authorized carrier will provide the lessor with a certificate of insurance for each such policy. Each certificate of insurance shall include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the lessor for each type of coverage, and the deductible amount for each type of coverage for which the lessor may be liable.

> (3) The lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements. The lease shall further specify that the authorized carrier must provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made.

49 C.F.R. § 376.12(j). The Court now addresses Treadway's claimed violations with respect to

each of his leases.

### 1. 2017 Lease

According to Treadway, the 2017 Lease violated all three subsections of § 376.12(j). He

points to the fact that his settlement statements reflect a weekly deduction of between $80 to

$184 per week for "TRUCK INSURANCE." (DRPSF ¶ 32.) That insurance is different from the occupational-accident insurance listed among Schedule B's authorized deductions. (*Id.* ¶¶ 22–23.) Yet Treadway contends that the 2017 Lease does not explain what this insurance is and why it is being charged back to Treadway. Nor does the 2017 Lease state that Carrier One would provide Treadway with a copy of the policy or a complete certificate of insurance for that policy. Finally, the 2017 Lease does not address potential deductions for cargo or property damage.

Defendants respond that the 2017 Lease fully complied with § 376.12(j). To begin, as required under § 376.12(j)(1), Schedule C assigned Treadway the responsibility to maintain the certain types of insurance, including non-trucking liability and deadhead insurance, and physical-damage insurance covering the value of his truck. (PRDSF ¶¶ 30, 53; 2017 Lease at 15.) And Defendants note that Carrier One did not offer that insurance coverage to Treadway, but he instead purchased it through Impel Union contemporaneous with his execution of the Truck Lease. (PRDSF ¶¶ 32, 44; PRDSAF ¶¶ 1, 15; DRPSAF ¶ 4.) Then, Treadway signed an authorization form directing Carrier One to deduct "Weekly Truck/Trailer Insurance" from his settlement statements with the amounts paid immediately to Impel Union. (PRDSF ¶¶ 54, 56, 58; PRDSAF ¶ 15; Suppl. Smit Aff., Exs. 63, 68, Dkt. Nos. 137-6, 137-8.) Those weekly insurance payments are what are deducted as "TRUCK INSURANCE" on Treadway's settlement statements. (PRDSAF ¶ 15.) Consequently, Defendants contend that the undisputed evidence demonstrates that the 2017 Lease complied with § 376.12(j) by specifying Treadway's responsibility to maintain the insurance coverage corresponding to the weekly "TRUCK INSURANCE" deduction. And because Treadway authorized that deduction to cover his purchase of insurance from Impel Union, those deductions do not constitute chargebacks mandating any further disclosures under § 376.12(j).

Even accepting Defendants' evidence showing that Treadway nominally purchased certain insurance through Impel Union, Treadway contends that Carrier One cannot use Impel Union as a shield against its obligations under § 376.12(j) given the close relationship between the two companies. Notably, Treadway's argument is not premised on the contention that Impel Union and Carrier One are alter egos. Rather, Treadway cites a case finding that "entities 'affiliated' with registered motor carriers" are themselves covered by the Truth-in-Leasing regulations. *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 87 F. Supp. 2d 820, 828 (S.D. Ohio 2000).[8] And "common ownership" and "common officers" would be enough to establish such affiliation. *Id.* at 829. To the extent a mere affiliation between Carrier One and Impel Union is enough to make Carrier One liable under § 376.12(j), the Court finds the evidence of their affiliation lacking, supported largely by an exhibit to a complaint filed in a separate action not involving Treadway. (*See* DRPSF ¶ 55.[9])

In any case, assuming that the 2017 Lease or any agreement he had with Impel Union did not comply with § 376.12(j), Treadway fails to adduce evidence of how any violation damaged him. *See Cunningham*, 662 F. Supp. 2d at 1275 (rejecting the plaintiffs' request for a full refund of deductions for insurance premiums absent a showing of how the § 376.12(j) violation caused them harm). He offers no evidence showing that Impel Union did not, in fact, provide proper insurance in exchange for his payments. Nor does Treadway come forward with evidence that he could have saved money on the requisite insurance coverage or avoided some other expense had Carrier One or Impel Union provided the disclosures required by § 376.12(j). Thus, the Court

---

[8] Unlike here, the affiliated entity was itself a defendant in *Arctic Express*. *See Arctic Express*, 87 F. Supp. 2d at 821, 829.

[9] This is the one instance where Defendants' objection to a Treadway factual assertion is well taken.

grants summary judgment in Defendants' favor and denies summary judgment to Treadway with respect to Treadway's claim that the 2017 Lease failed to comply with § 376.12(j).

2.    <em>2019 Lease</em>

In Schedule B to the 2019 Lease, there is a page that allowed Treadway to elect whether he wanted to obtain physical-damage insurance from or through Carrier One. (DRPSF ¶ 69; 2019 Lease at 27.) While Treadway initialed "YES," thus indicating that he wanted the insurance charged back to him, there were blanks where Carrier One was meant to provide information about the insurance and its cost. (*Id.*) The Court agrees that, by showing that Carrier One failed to provide the information required under § 376.12(j), Treadway has proved a violation of the Truth-in-Leasing regulations. However, Treadway does not show how the 2019 Lease's § 376.12(j) violation caused him any damage. Though Treadway claims he is entitled to a full refund of the amounts he paid on this insurance, as above, he fails to show that he was not actually receiving appropriate insurance or that he could have saved money on the insurance he received had Carrier One provided the disclosures required under § 376.12(j). For that reason, the Court grants Defendants' motion for summary judgment and denies Treadway's motion as to the § 376.12(j) claim under the 2019 Lease.

### F. Escrow Funds

The final alleged Truth-in-Leasing violation at issue in the parties' motions arises under the escrow funds provisions of § 376.12(k). Under that regulation:

If escrow funds are required, the lease shall specify:

(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.

(2) The specific items to which the escrow fund can be applied.

(3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions

29

involving such fund. The carrier shall perform this accounting in one of the following ways:

> (i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or

> (ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. . . .

(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor of all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

*Id.* Section 376.12(k), "through its comprehensive delineation of responsibilities, imposes strict fiduciary obligations on motor carriers, such that it places the motor carriers in a position of trust vis-à-vis owner-operators with regard to the handling of escrow funds." *In re Arctic Express Inc.*, 636 F.3d 781, 794 (6th Cir. 2011). For purposes of the regulation, an escrow fund means "[m]oney deposited by the lessor [owner-operator] with either a third party or to the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee." *Id.* (quoting 49 C.F.R. § 376.2(l)).[10]

---

[10] Defendants' motion for summary judgment does not specifically address Treadway's claimed escrow-funds violation. Insofar as Defendants seek summary judgment on this claim, it appears they do so only

Schedule B to the 2017 Lease authorizes deductions for a $0.05 per mile charge going to a maintenance fund and a $1000 trailer security deposit, to be deducted in 20 weekly installments of $50. (DRPSF ¶ 22.) Defendants do not dispute Treadway's claim that each of those deductions went to the creation and maintenance of an escrow fund under § 376.12(k). Yet the 2017 Lease provides no further elaboration on what the maintenance fund or trailer security deposit covers, and Defendants make no attempt to explain how the 2017 Lease complied with the obligations imposed by § 376.12(k). Thus, Treadway has established that the 2017 Lease violated § 376.12(k).

Subsequently, when he signed the 2019 Lease, Treadway also executed the Addendum to the 2019 Lease, which lists several deductions to be paid to Impel Union and were supposedly voluntary. (DRPSF ¶¶ 66, 68, 71.) One of the deductions in the Addendum to 2019 Lease was for "Truck Maintenance." (*Id.* ¶ 68.) But Treadway blacked out the blank meant for the rate of the amount of the per mile charge, thereby indicating his intention to opt out of the voluntary fund. (*Id.* ¶ 69.) Still, Carrier One continued to take a $0.05 per mile deduction from Treadway's settlement statements. (*Id.*) When it terminated Treadway, Carrier One did not reimburse the $3,376.95 balance in his maintenance fund or any portion of the $1,000 security deposit. (*Id.* ¶ 80.)

The Court finds that the 2019 Lease gave Carrier One no basis for making deductions toward a voluntary maintenance fund, since Treadway did not agree to an amount to be deducted per mile. By nonetheless continuing to take maintenance fund deductions, Carrier One was not complying with § 376.12(k)(1)'s direction that a lease specify "[t]he amount of any escrow fund

---

under their generally applicable contention that Treadway failed to establish his actual damages from any Truth-in-Leasing violation.

or performance bond required to be paid" by the owner-operator. Nor was Carrier One entitled to continue to deduct $0.05 per mile pursuant to Treadway's authorization of that deduction in the 2017 Lease. Rather, the 2019 Lease expressly states that it "fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings, except as provided in Section 27 of this Agreement." (2019 Lease § 20(e).) Section 27 then provides that "[b]alances in escrow funds created under any previous written agreement between the parties will be credited to the Escrow Fund created under this Agreement (if any)." (*Id.* § 27.) These provisions therefore make clear that Carrier One cannot invoke the 2017 Lease to justify its continued deduction of $0.05 per mile toward the maintenance fund. In taking and retaining funds to which the 2019 Lease provided it no entitlement, Carrier One violated § 376.12(k).

Turning to damages, the Court has already noted that Treadway can demonstrate an injury from Carrier One's failure to pay interest on its escrow deductions and then return those deductions after it terminated Treadway. As to interest, Treadway claims that Carrier One did not pay interest on either his trailer security deposit or his maintenance fund but points to no evidence in support of that fact. Nor does he submit any estimate of the interest he should have earned on those funds.

There is no genuine dispute, however, that Carrier One never returned any portion of Treadway's two escrow funds. (DRPSF ¶¶ 77, 80.) Carrier One contends that it "reimbursed" those funds by using them to pay off negative balances Treadway owed to Carrier One at the time of his termination. (*Id.*) But the 2017 Lease was silent as to escrow funds, meaning it did not comply with § 376.12(k)(2)'s requirement that it state "[t]he specific items to which the escrow fund can be applied." Moreover, § 376.12(k)(6) makes clear that Carrier One could only "deduct monies for those obligations incurred by the [owner-operator] which have been

previously specified in the lease." Carrier One specified nothing in the 2017 Lease and, as such, had no right to deduct anything from Treadway's escrow funds. Certainly, Carrier One was not entitled to use the money in Treadway's escrow funds to settle all the obligations that it deemed him to owe at the time of his termination. *See Owner-Operator Indep. Drivers Ass'n v. Ledar Transp.*, No. 00-0258-CV-W-FJG, 2004 WL 5249148, at *2 (W.D. Mo. Dec. 30, 2004) ("By failing to specify the items that may be deducted from the security deposit, [the carrier] has transformed the security deposit into a general fund to satisfy any obligations incurred by [owner-operators], which is a violation of the letter and spirit of the regulations." (internal quotation marks and citations omitted)); *cf. Owner Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 159 F. Supp. 2d 1067, 1078 (S.D. Ohio 2001) ("When the Defendants provided for everything to be covered by the maintenance fund, they, in reality, specified nothing."). Finally, Treadway suffered actual damages from Carrier One's continued maintenance fund deductions after the 2019 Lease went into effect. By taking money not authorized by the 2019 Lease, Carrier One paid Treadway less than what it had promised him.

In sum, Treadway has established that Carrier One took money for escrow funds without complying with § 376.12(k), and that he was damaged by Carrier One's failure to return those deductions in full. For these reasons, the Court grants Treadway summary judgment as to his escrow-funds Truth-in-Leasing claim and denies Defendants' motion. As to the trailer security deposit, the Court awards summary judgment for the full $1,000 that Carrier One retained. By contrast, the Court declines to enter summary judgment at this time regarding the amount of Treadway's maintenance-fund-related damages. Treadway's presentation of his evidence on his maintenance fund damages creates uncertainty as to his requested award. Specifically, in a summary table in his summary judgment brief, Treadway seems to claim three figures as

damages from Carrier One's § 376.12(k) violation: the $4,120.90 in maintenance fund deductions taken when the 2019 Lease was in effect; the $3,338.81 that Carrier One withdrew from Treadway's maintenance fund prior to terminating Treadway; and the $3,376.95 balance in the maintenance fund at the time of his termination. (Pl.'s Br. in Supp. of Mot. for Summ. J. at 20–21, Dkt. No. 115; *see also* DRPSF ¶¶ 71, 80.) At the same time, his brief includes this asterisk: "To the extent that any of these amounts are duplicative, Plaintiffs acknowledge that judgment should be reduced by the amount of duplication." (Pl.'s Br. in Supp. of Mot. for Summ. J. at 21.) With that caveat, Treadway apparently concedes that he does not have a final figure for his maintenance fund damages. Without that information, the Court cannot enter summary judgment as to the amount of those damages.

## II.    IWPCA

With his IWPCA claim, Treadway seeks to recoup from Defendants the allegedly wrongful deductions that they took from his compensation along with other unreimbursed business expenses. The IWPCA allows employees to sue their employer for the timely and complete payment of earned wages and prohibits employers from taking unauthorized deductions from employees' wages. *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016); *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016). It applies to all "employers and employees in [Illinois]." 820 ILCS 115/1. To prove an IWPCA claim, an employee must "demonstrate that they are owed compensation from defendants pursuant to an employment agreement." *Enger*, 812 F.3d at 568.

In his motion, Treadway begins with the threshold issue of whether he is an "employee" covered by the IWPCA and then argues that he is entitled to reimbursement of certain sums owed by Carrier One. Defendants' motion also begins with a threshold issue concerning the IWPCA's extraterritorial reach and then goes on to argue that they fully complied with the

IWPCA. Further, Defendants assert that, to the extent Carrier One may be liable under the IWPCA, the Court should nonetheless rule that Samarov cannot be held individually liable. The Court begins with the two threshold issues before turning to matters concerning Defendants' respective liability under the IWPCA.

### A.    Extraterritorial Application

Returning to an issue previously raised in their motion to dismiss, Defendants contend that the undisputed evidence establishes that Treadway, a nonresident of Illinois, did not perform enough work in Illinois to maintain a claim under the IWPCA. Seventh Circuit precedent holds that the IWPCA does not have an "extraterritorial reach." *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998). Rather, the IWPCA's "evident purpose is to protect employees ***in Illinois*** from being stiffed by their employers." *Id.* Accordingly, the IWPCA does not apply to out-of-state residents who conduct no work in Illinois. *Id.* At the same time, the IWPCA's "applicability to nonresidents who perform their work in Illinois for an instate employer is sufficiently clear." *Adams v. Catrambone*, 359 F.3d 858, 864 (7th Cir. 2004).

As this Court explained in its motion to dismiss ruling, "district courts have applied *Glass* and *Adams* to find that the IWPCA 'does not apply simply because an employee has performed ***any*** work in Illinois for an Illinois employer.'" *Niiranen*, 2022 WL 103722, at *3 (quoting *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1174–75 (N.D. Ill. 2016)). While the Court recognized that "[n]o court of binding authority has set forth a minimum quantum of work in Illinois to qualify as an employee under the [IWPCA]," it reserved the question of whether Treadway performed enough work in Illinois for the summary judgment stage. *Id.* at *3–4 (quoting *Yata v. BDJ Trucking Co.*, No. 17 cv 3503, 2018 WL 3303290, at *5 (N.D. Ill. July 5, 2018)). Now, that question is squarely before the Court.

At all relevant times, Treadway was a Texas resident. (PRDSF ¶ 23.) And, for the majority of his time driving for Carrier One, Carrier One was an Illinois employer. (DRPSF ¶¶ 9, 20, 80; PRDSF ¶¶ 38, 43.) Whereas Carrier One claims that the evidence shows Treadway only drove 8.8% of his loads in Illinois, Treadway asserts that the evidence supports a 13.1% figure. (PRDSF ¶ 39.) Even if Treadway performed only 8.8% of his work in Illinois, that is enough work for him to maintain a claim under the IWPCA on the facts here. Especially given the context of Treadway's work as an over-the-road driver, the percentage of the time Treadway spent driving in Illinois is less important than the nexus his assigned work had with the State. In that respect, Treadway's work in Illinois is better measured by the destinations from where Treadway's loads were coming or going. Over the three-year period Treadway worked for Carrier One, about 71 of his loads originated in Illinois and 66 were delivered to a destination in Illinois. (DRPSAF ¶ 25.) That evidence shows that Treadway had regular contacts with Illinois, and his contacts were directly in service of Carrier One's Illinois-based business interests.

Next, Carrier One contends that the IWPCA ceased to apply when Carrier One moved its headquarters to Indiana. Yet Carrier One offers no legal support for that proposition. The Court finds that Carrier One has waived that argument by failing to develop it properly. And in any case, "courts have allowed IWPCA claims against employers that are organized and headquartered in a different state when there are allegations of substantial in-state activity." *Parise v. Integrated Shipping Sols., Inc.*, 292 F. Supp. 3d 801, 807 (N.D. Ill. 2017) (internal quotation marks omitted). Carrier One continued to conduct substantial activity in Illinois, as it was registered there as a foreign corporation and had a registered agent there. (DRPSAF ¶ 26.) Meanwhile, Treadway continued to deliver loads that either originated or terminated in Illinois. (*Id.* ¶ 25.) Finally, the 2019 Lease governing Treadway's relationship with Carrier One expressly

36

stated the 2019 Lease and any claim or dispute arising under it would be governed by Illinois law. (*Id.* ¶ 35.)

Because Treadway had regular contacts with Illinois directly related to his work for Carrier One, the Court concludes that Treadway performed enough work in Illinois to maintain his IWPCA claim. In so holding, the Court expresses no opinion on where exactly the minimum quantum of work should be set for IWPCA coverage; it concludes only that Treadway's work clears that threshold.

### B. Covered Employee

The second threshold issue concerns whether Treadway qualifies as an employee under the IWPCA. Independent contractors are not employees covered by the IWPCA. *Lane v. Le Brocq*, No. 15 C 6177, 2016 WL 5955536, at *4 (N.D. Ill. Oct. 12, 2016). But the IWPCA regards all individuals who work for an employer to be an employee unless they meet the statute's independent-contractor exemption, which excludes from the statutory definition of an employee any individual:

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and
>
> (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and
>
> (3) who is in an independently established trade, occupation, profession or business.

820 ILCS 115/2. Commonly known as the "ABC test," this "test is conjunctive, meaning that if an employer cannot satisfy each of the prongs, then the individual must be classified as an employee for purposes of the IWPCA." *Costello*, 810 F.3d at 1050. Thus, while Treadway only

argues based on the first and second prongs, he need only satisfy one to establish his employee status for purposes of the IWPCA.

Here, the Court finds that there is no dispute of material fact that Treadway's work for Carrier One was within its usual course of business and performed in its normal places of business. "[W]hen considering the usual course of business of the employing unit, the . . . . key to this inquiry is whether the services are necessary to the business of the employing unit or merely incidental." *Carpetland USA, Inc. v. Ill. Dep't of Emp. Sec.*, 776 N.E.2d 166, 186 (Ill. 2002). Carrier One's usual course of business is the over-the-road transportation of freight. (DRPSF ¶ 1.) As one of the drivers tasked with transporting freight for Carrier One's customers, Treadway's work is essential to Carrier One's business. *See Carpetland*, 776 N.E.2d at 186 ("When one is in the business of dispatching limousines, the services of chauffeurs are provided in the usual course of business because the act of driving is necessary to the business."); *C.R. England, Inc. v. Dep't of Emp. Sec.*, 7 N.E.3d 864, 876 (Ill. App. Ct. 2014) ("[F]reight-hauling and motor carrier business would not exist without drivers . . . to lease and drive the trucks and haul the freight.").[11] Similarly, given the nature of a freight transportation business, Carrier One's place of business encompasses the roadways on which its drivers travel. *See Prokhorov v. IIK Transp., Inc.*, No. 20 CV 6807, 2024 WL 3694523, at *8 (N.D. Ill. Aug. 7, 2024) ("[The motor carrier's] place of business extended to the delivery routes that drivers took regardless of whether those routes crossed state lines."); *C.R. England*, 7 N.E.3d at 877 (holding that, given the nature of a freight-hauling business, the motor carrier's usual place of work encompassed "all

---

[11] Both *Carpetland* and *C.R. England* are decisions addressing the Illinois Unemployment Insurance Act's independent-contractor exemption, which sets forth a substantially similar ABC test as here. *Compare* 820 ILCS 405/212, *with* 820 ILCS 115/2.

the locations where [its drivers] provided these freight hauling services," including the roadways and pick-up and drop-off points).

Defendants cannot credibly contest that Treadway's work was performed both in Carrier One's usual course of business and at its usual places of business. Accordingly, the Court finds that the undisputed facts demonstrate that Defendants cannot satisfy the second prong of the IWPCA's independent-contractor exemption, and therefore, Treadway is an employee who may assert an IWPCA claim.

### C. Prohibited Deductions

Turning to the merits of Treadway's IWPCA claim, Treadway first contends that Defendants violated the IWPCA by taking improper deductions from his compensation in the weekly settlement statements. Under 820 ILCS 115/9, an employer is prohibited from taking deductions from an employee's wages unless the deduction meets one of certain statutory criteria. Relevant here, a deduction is not prohibited if it is "to the benefit of the employee," or "made with the express written consent of the employee, given freely at the time the deduction is made." *Id.*[12]

#### 1. *Written Consent*

First, Defendants argue that Treadway gave his express written consent to the deductions listed in the Schedule B to each of the 2017 Lease and the 2019 Lease when he executed those documents. In assessing whether an employee gave his written consent for deductions, courts

---

[12] The IWPCA also permits deductions when "required by law." 820 ILCS 115/9. Defendants briefly suggest that their deductions were required by the Truth-in-Leasing regulations. The Court rejects that perfunctory and underdeveloped argument—Defendants cite no Truth-in-Leasing regulation that affirmatively requires an authorized carrier to take a deduction or make a chargeback, nor is the Court aware of one.

consult the applicable state regulation implementing the IWPCA. *E.g.*, *Prokhorov*, 2024 WL 3694523, at *9. The version applicable here states that:

> a) Any written agreement between employer and claimant permitting or authorizing deductions from wages or final compensation must be given freely at the time the deduction is made. . . .

> b) When a deduction is to continue over a period of time and the written agreement provides for that period of time, provides for the same amount of deduction each period and allows for voluntary withdrawal for the deduction, the agreement shall be considered to be given freely at the time the deduction is made.

Ill. Admin. Code tit. 56, § 300.720 (2014).[13]

With respect to Schedule B's one-time deductions—$30 for "MVR/PSP," $60 for a "Drug screen," and $30 for certain state permits, all taken from Treadway's first settlement statement (PRDSF ¶ 35)—the Court finds no genuine dispute of material fact as to whether Treadway provided express written consent. He did. Those deductions were taken only once, and Schedule B to the 2017 Lease clearly specifies how much would be taken for those deductions. Treadway raises no substantive argument with respect to those three deductions.

By contrast, Schedule B also authorizes several ongoing deductions. One category of such deductions consisted of deductions to be taken at a specified amount per week. (DRPSF ¶ 22; PRDSF ¶¶ 32, 34; 2017 Lease at 14; 2019 Lease at 24–25.) The other category was comprised of deductions assessed at a specified rate charged per mile. (*Id.*) Since both categories of deductions continued over a period of time, they must comply with Ill. Admin. Code. tit. 56, § 300.720(b). However, Defendants do not point to a provision in either the 2017 Lease or the 2019 Lease allowing for voluntary withdrawal of any of those deductions. *E.g.*, *Piquion*, 2023 WL 8113379, at *19 (finding that express written consent was not given for ongoing deductions

---

[13] The regulation was amended in 2023, but the Court consults the prior version of the regulation since that was the version in effect at all times relevant to this case. *Prokhorov*, 2024 WL 3694523, at *9.

where "[n]othing in the [relevant written agreement] suggests that Plaintiffs could have voluntarily withdrawn from the challenged deductions"). Moreover, the category of deductions assessed at a rate charged per mile appears to run afoul of the requirement that the deduction be the same per period. *E.g.*, *Noe v. Smart Mortg. Ctrs., Inc.*, No. 1:21-CV-01668, 2024 WL 4346562, at *14 (N.D. Ill. Sept. 29, 2024) (explaining that proper consent is not provided where the agreement did "not provide for specific or predictable amounts of deductions"). Thus, the Court concludes that Defendants did not obtain Treadway's freely given written consent for any of the ongoing deductions.

### 2. *To the Employee's Benefit*

Defendants assert that the deductions were all to Treadway's benefit. Whether a deduction is to the benefit of the employee turns on whether the deduction itself benefits the employee as opposed to the underlying expense. *Bell v. Bimbo Food Bakeries Distrib., Inc.*, No. 11 C 03343, 2013 WL 6253450, at *4 (N.D. Ill. Dec. 3, 2013). For most of the challenged deductions, Defendants make conclusory statements about the benefit Treadway received but offer no evidentiary support. Such unadorned claims of a benefit do not suffice to demonstrate the absence of a genuine dispute of fact.

Nonetheless, the Court does find that Defendants have substantiated the benefit of deductions from Treadway's settlement statements associated with Treadway's use of the fuel discount card. Those deductions allowed Treadway to take advantage of the fuel discount Carrier One negotiated with various truck stops—the fuel was initially charged to Carrier One to trigger its discount and then deducted at a discounted rate from Treadway's settlement statements. (PRDSF ¶ 46.) Defendants are therefore entitled to summary judgment but only for the deductions associated with the purchased fuel. By contrast, Defendants fail to show how

Treadway benefitted from the deduction of the $0.50 transaction fee applicable to each use of the fuel discount card.

### D.     Unreimbursed Expenses

For his part, Treadway seeks summary judgment with respect to his claim for reimbursement of the weekly truck insurance deductions and escrow fund deductions that Carrier One took from his compensation. Pursuant to 820 ILCS 115/9.5(a), "[a]n employer shall reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer." As used in the statute, "'necessary expenditures' means all reasonable expenditures or losses required of the employee in the discharge of employment duties and that inure to the primary benefit of the employer." *Id.* Treadway contends that he is entitled to reimbursement for the total sum of the truck insurance and escrow fund deductions, as those deductions constituted expenses that he incurred within the scope of his employment and directly related to his freight-hauling duties.

As an initial matter, the Court finds that Defendants waived their two arguments against Treadway's claim based on 820 ILCS 115/9.5(a) by raising them in a manner that deprived Treadway of an opportunity to respond. In their reply in support of their motion for summary judgment, Defendants argue that because 820 ILCS 115/9.5(a) was only enacted on January 1, 2019, Treadway's claim for expenses from before that date should be stricken. That was an argument Defendants could have raised in their opposition to Treadway's motion for summary judgment, such that Treadway could respond in his reply. Instead, Defendants decided to first assert it in their reply to their own motion for summary judgment, leaving Treadway with no opportunity to respond. It is therefore waived. *E.g.*, *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave

42

no chance to respond."). Likewise, in a notice of supplemental authority, Defendants point to a case in which the district court rejected a claim for reimbursement under 820 ILCS 115/9.5 due to the plaintiff's failure to submit expenses for reimbursement to his employer. (Dkt. No. 164.) That argument could have been raised in any of Defendants' briefs since the statute itself imposes that requirement: "An employee shall submit any necessary expenditure with appropriate supporting documentation within 30 calendar days after incurring the expense . . . ." 820 ILCS 115/9.5(a). The Court will not entertain an argument that was only raised after the briefing schedule had closed.

As to Treadway's requested reimbursements, the Court finds that he is entitled to have his escrow fund deductions returned to him. For the reasons discussed above, Carrier One treated those contributions as akin to a general fund to cover what it claimed were Treadway's unpaid obligations. Thus, Treadway is entitled to recover those deductions in full pursuant to 820 ILCS 115/9.5(a). The Court also agrees that Treadway is entitled to be reimbursed for his truck insurance payments. While the truck insurance deductions were transferred immediately to Impel Union, the insurance coverage was required by Carrier One per Schedule C to both the 2017 Lease and the 2019 Lease. (DRPSAF ¶ 4; 2017 Lease at 15–16; 2019 Lease at 29–31.) Further, both the 2017 Lease and the 2019 Lease required Treadway to name Carrier One as an additional insured on the insurance policies that it required him to obtain. (2017 Lease at 16; 2019 Lease at 31.) This evidence establishes that Treadway's truck insurance expenditures were required, necessary, and inured to Carrier One's benefit.

Because Treadway has shown he is entitled to be reimbursed for his expenses related to the escrow funds and his truck insurance, the Court grants his motion for summary judgment as to those two IWPCA claims. As the Court noted above, the Court cannot find that there is no

dispute of material facts as to the damages award with respect to the escrow funds. For the truck insurance payments, it is undisputed that Defendants deducted $27,876 total from Treadway's compensation. (DRPSF ¶ 36.) Accordingly, Treadway is granted summary judgment with respect to that amount on his truck insurance reimbursement claim.

### E.     Other Compensation Owed

Finally, Treadway contends that he is entitled to reimbursement of the amounts withheld from his 80% share of revenue supposedly to compensate Carrier One's broker, Sarisa. As discussed above, under the 2017 Lease, Carrier One was not permitted to subtract broker commissions from the gross revenue figure. Consequently, Treadway is entitled to recover that sum pursuant to the IWPCA. On the other hand, there remain questions of fact as to whether Sarisa's broker commissions were improperly withheld under the 2019 Lease. The Court therefore grants Treadway summary judgment only as to his recovery under the 2017 Lease.

### F.     Samarov's Individual Liability

To the extent Carrier One may be liable for IWPCA violations, Defendants ask that the Court enter summary judgment holding that Samarov is not individually liable for any violations. The IWPCA provides that, in addition to the employer, "any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the IWPCA] shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13. "Courts in this district have interpreted 'knowingly permit' to mean advise, consent, affect, or consult." *Gibbs v. ABT Elecs., Inc.*, No. 21 CV 6277, 2022 WL 16540182, at *4 (N.D. Ill. Oct. 28, 2022) (internal quotation marks omitted).

In his deposition, Samarov testified that he "was the one developing the compensation structure for all the [drivers] that we were contracting" and had knowledge of the terms of all the lease agreements he presented to his drivers. (DRPSAF ¶ 37.) That testimony regarding

44

Samarov's involvement in deciding Carrier One's drivers' compensation creates at least a dispute of fact as to his individual liability for Carrier One's IWPCA violations, and Defendants counter that testimony with no evidence of their own. Accordingly, this Court concludes that there is a genuine issue of fact as to whether Samarov knowingly permitted Carrier One's IWPCA violations and denies Defendants' request for summary judgment as to Samarov's individual liability.

### III.    Breach of Contract

Although Defendants request summary judgment on Treadway's breach of contract claim, they never substantively address that claim in their briefs. Given Defendants' failure to develop any argument against it, the Court denies them summary judgment as to the breach of contract claim.

### CONCLUSION

For the foregoing reasons, Defendants' motion to strike (Dkt. No. 131) is denied, and Defendants' motion for summary judgment (Dkt. No. 112) and Treadway's motion for partial summary judgment (Dkt. No. 115) are each granted in part and denied in part.


ENTERED:

Dated:  March 21, 2025

_____
Andrea R. Wood
United States District Judge

45